THOMAS DIEHL and others v. JOHN PAGE and others.

On a bill filed to avoid a title as fraudulent, if it appear that the complainants have no title, they will not be permitted to impeach the title of the defendants.

*The judgment of a court of common pleas, rendered in a proceeding by attachment against an absent or absconding debtor, though irregular and not pursuant to the statute, is not *void*, and cannot be impeached collaterally.

The court has a general jurisdiction over the whole subject matter; and although it acted under the requisitions of a particular statute, and not according to the course of the common law, it is not thereby degraded into a court of such inferior and limited jurisdiction as that all its proceedings while acting within its jurisdiction, are rendered void if a single requisition of the statute be not complied with.

A party who purchases from one not in possession of the bargained premises, cannot claim to be a bona fide purchaser without notice ; for possession in another is notice sufficient to put the party on enquiry.

THE bill was filed by parties claiming title under a sheriff's sale, made by virtue of a judgment rendered on an attachment against an absent debtor, to avoid a conveyance made by the debtor previous to the issuing of the writ of attachment, and also a subsequent conveyance from the grantee of the debtor, as fraudulent. The facts relied upon to sustain the charge of fraud, appear in the chancellor's opinion. Answers were filed by the defendant in attachment, the original grantor, and also by the parties claiming title under his grantee at the time of filing the bill. The cause was heard upon the pleadings and proofs.

*Jeffers,* for complainants.

*Eakin* and *Williamson,* for defendants.

Cases cited for the complainants. 3 *John. Chan. R.* 275 ; 4 *Ibid,* 85, 92 ; 6 *Ibid,* 235 ; 7 *Ibid,* 174, 182.

Cases cited for the defendants. 6 *Bac. Ab. "Statute ;"* 5 *Halsted,* 250 ; 12 *Vesey,* 324 ; 3 *Ves. and B.* 42.

* See *Pittenger's Adm'r* v. *Pittenger,* post.

[Diehl et al. v. Page et al.]

THE CHANCELLOR. Thomas Diehl and one William Guier, in the year 1818, obtained a judgment in the supreme court of Pennsylvania, against John Page, for one thousand eight hundred and ninety-five dollars and sixty-two cents. The judgment remaining unsatisfied, and Page having afterwards acquired title to the undivided moiety of a plantation in the county of Salem, they sued out an attachment from the court of common pleas of that county, against Page, as a non-resident debtor, returnable to the term of March, 1826, and thereby attached the said property and the rents of it, in the hands of Thomas Wright and Peter Wright, the tenants and two of the defendants. Such proceedings were then had in the attachment, as that in the term of September, 1826, judgment was rendered in favor of the plaintiffs for three thousand and forty-nine dollars and twelve and a half cents, besides costs. The auditors sold the property on the twentieth of December, and it was purchased by Thomas Diehl and William Guier, for one thousand nine hundred and ninety-nine dollars; upon which the auditors made them a deed.

After stating the foregoing facts, the bill proceeds to state, in substance, that Page, knowing that his interest in the premises was about to be attached by the complainants, fraudulently and without consideration, executed a deed of conveyance to one Isaac H. Booth, for all his interest; which deed bears date on the fourth day of June, that being about the time that Page obtained possession of the property under a judgment at law.

It further charges, that Booth is a very poor man, and in the lowest walks of life; that he is not and never was possessed of any property, and earns his living by daily labor as a journeyman comb-maker, and sometimes as a common and day laborer about the city of Philadelphia, and was induced to lend his name by the promise of reward. That there was no money paid, nor was Booth able to pay any. That after the pretended conveyance, Page, with the knowledge of Booth, made a contract with Wright the tenant, and held himself out as the real owner of the premises, offered to sell and mortgage them to raise money, and exercised ownership over them in as full and absolute a manner as

[Diehl et al. v. Page et al.]

he ever had done. That afterwards, the said Page made another pretended sale of the property to Samuel C. Atkinson, of Philadelphia, and one Champion Clark, of Gloucester county, who now pretend to claim the same by virtue of a deed from Booth and wife, dated June first, 1829, for the alleged consideration of four thousand seven hundred and fifty dollars; that no money was paid, but Clark and Atkinson gave a mortgage to Booth for four thousand seven hundred and fifty dollars; all of which transactions were fraudulent, and brought about by the procurement of Page.

William Guier having departed this life, his interest has be come vested in his son, William Guier, and his daughter, Mary Ann, now the wife of William Kennedy, who, with Thomas Diehl, are the complainants in this suit.

The bill prays, that all the conveyances above mentioned from Page and his assignees, may be declared fraudulent and void and be set aside, and that the tenant may come to an account for the rents, &c.

John Page, in his answer, admits the issuing of the attachment, and that the property in question was seized on and sold, but insists, that the proceedings in the attachment were irregular; that there was no legal advertisement either of the issuing of the writ, or of the sale of the property, and that the judgment and conveyance founded on it are wholly inoperative and void. He denies that the conveyance to Booth was fraudulent, and insists that it was bona fide, and that he gave a warranty deed, which he would not have done if the said deed had been fraudulent. He answers nothing as to the pecuniary circumstances of Booth, but says he was of respectable character and standing, a comb-maker in Philadelphia; that he was desirous of changing his business for one of a more active nature, and knowing of this property which he, Page, had recovered in New-Jersey, he, after viewing it, proposed to purchase it, and agreed to give four thousand dollars for it, which was supposed could easily be made by a person going thereon and felling timber and wood; and having confidence in Booth's honesty, he sold it to him, believing he would

19

be able to pay by instalments or otherwise. Page further denies that he ever offered it for sale after the sale to Booth, or exercised any acts of ownership over it.

Clark and Atkinson, in their answer, set up the same defence as Page, in relation to the attachment and the proceedings under it, insisting that they are void. They deny any knowledge of fraud as between Booth and Page, and allege, that believing the value of the property to be considerable, they purchased it of Booth by deed dated June first, 1829, for the bona fide consideration of four thousand seven hundred and fifty dollars; and to secure the payment of the same, they gave him a mortgage on the property, (for what amount is not mentioned.) That the said Booth sold the property because the rents and profits were lying dead and unproductive, and because he was unable to use the property.

Booth and wife have put in no answer, and that of Peter and Thomas Wright, the tenants, is merely formal.

Considerable testimony has been taken by the complainants, to sustain the charge of fraud as made in the bill; but it is necessary, in the first place, to take up and dispose of the first ground of defence assumed by the defendants; that questions the right of the complainants to come into court and set up any claim whatever to the property. It insists that the judgment on which their title is founded, and the conveyance under which they held it, are both irregular and void, and that no valid claim can be exerted under them or either of them. If this be so, it will be unnecessary to consider the question of fraud; for if the complainants have no title, they cannot be permitted to impeach that of the defendants.

Taking the defendants' evidence as admissible, there would seem to be much irregularity in the proceedings under the attachment. There were two suits instituted, one of which was continued to judgment, and the other ceased soon after the return of the writ. One of them was in the name of Diehl alone, the other in the names of Guier and Diehl. The notice of issuing the attachment appears to have been in the first, and not in the

[Diehl et al. v. Page et al.]

second suit, and it is doubtful whether the publication was continued for the period of time prescribed by the statute. These matters do not, however, appear upon the record, which I apprehend is the proper instrument to govern the court. But even the record as made out is defective, in my judgment, and before a tribunal lawfully charged with the correction of errors, I think it might have been set aside.

This, however, is not the question. We are not to inquire whether the judgment is erroneous and irregular, but whether it is void, and, coming up collaterally before this court, is to be taken as a nullity. On this question there ought to be no doubt. The jurisdiction of the court which rendered the judgment was complete. It was a general jurisdiction over the whole subject matter; and while acting within that jurisdiction, their judgments are not to be impeached, though erroneous on the face of them. The court of common pleas did not in this case, it is true, proceed according to the course of the common law; it acted under the requisitions of a particular statute; but the principle is not thereby altered. It is not thereby degraded into a court of such inferior and limited jurisdiction, as that all its proceedings are rendered void, if a single requisition of the statute be uncomplied with. Case of the *Marshalsea*, 10 *Coke*, 76. *Kemper's lessee* v. *Kennedy et al.*, 5 *Cranch*, 173, is a strong case to show the distinction between what is technically called in the English books a court of limited and inferior jurisdiction, and a court invested by statute with a new and general jurisdiction over any particular subject matter committed to its cognizance. The several courts of common pleas of this state, having no criminal jurisdiction by their original constitution, were by an act of the legislature invested with power to render judgment upon inquisitions taken and found in cases of treason. In the proceeding and judgment brought up collaterally in that case, the court said, the judgment was clearly erroneous; but the court of common pleas being a court of record, and having general jurisdiction of the subject matter, its judgment could not be disregarded. It must stand until reversed.

[Diehl et al. v. Page et al.]

In *Den ex. Dem. Flomerfelt* v. *Zellers*, 2 *Hals.* 153, the court sustained a judgment upon a bond and warrant of attorney, under the act regulating such proceedings, although scarcely a single requirement of the act had been complied with, on the ground that the judge had cognizance of the subject matter, and the judgment, though voidable, could not be collaterally impeached and considered as a nullity. See also *Shottenkirk et al.* v. *Wheeler et al.*, 3 *John. Chan. R.* 275; *De Riemer et al.* v. *Cantillon et al.*, 4 *John. Chan. R.* 85. Indeed the principle is so well settled, as scarcely to need authority to support it. It is a safe one for purchasers, and is just and equitable in all its results.

The defendants' counsel endeavored to maintain, that this judgment might be impeached on the ground of fraud; that it was a fraud upon the court and the party. There can be no doubt that a record may be affected and even vitiated by fraud. The cases from 12 *Vesey*, 324, ( *White* v. *Hall*,) and 3 *Ves. and Bea.* 42, (*Hampson* v. *Hampson*,) fully prove the position, if it needed proof. But in both these cases the question of fraud was distinctly raised, and the issue was upon that point. It did not come up collaterally, as in the present case. But waiving this difficulty, I am not satisfied that there is fraud in the judgment. There is no pretence that the money was not due, or that the judgment was entered for too large a sum, or that any deception was practised on the defendants. If there was any thing like fraud, it must be a legal fraud, arising by implication from the irregularity of the proceedings. This would prove too much; for every irregularity might be considered as operating fraudulently in some sense, by depriving the party of some legal right or privilege. Nor does the fact that the attachment is a proceeding *in rem*, in which there is no personal notice, vary the matter. It is still nothing more than an irregularity, and must submit to be governed by the same unbending principle that governs all cases of the like nature.

The objection to the deed or conveyance, which is the next obstacle interposed against the complainants' claim, is, that the

auditors, in giving notice of the sale, mistook the name of one of the plaintiffs in attachment, and published it *Grier*, instead of *Guier*. I cannot consider this trifling inaccuracy, in a matter not material, sufficient to invalidate a title formed upon a sale, that appears to have been altogether fair and bona fide. If the mistake had been in the name of the defendant, it would have been more important, for then he might have been deceived and others also. If it had been in the description of the property, or the time or place of sale, it might have operated an injury, by misleading those who wished to purchase; but it is not perceived how the mistake of a single letter in the name of one of the plaintiffs, could have been attended with any evil consequences. In *Den* v. *Zellers*, 2 *Hals.* 153, the court held, that a small variance or inaccuracy in the description of the premises, should not impeach a sheriff's sale, when it appeared from the description that it must have been fully understood what property was to be sold.

Upon the whole, I am satisfied that this preliminary objection is unsound, and interposes no obstacle to the investigation of the question of fraud charged against the defendants, and which is directly put in issue by the pleadings.

Was, then, the conveyance from Page to Booth, a fraudulent and covinous conveyance, designed to defeat the rights of creditors?

In answering this inquiry, it is proper to look first to the answer of the defendant, Page. He was interrogated specifically on this point, and his response, if direct, positive and full, is entitled to much weight. The answer of Page as to this part of the case, is very far from being satisfactory. Some of the charges in the bill are not answered at all, others are evaded, while others again are answered according to the letter and not the spirit of the charge or interrogation. Some parts of it are argumentative and irrelevant, and taking the whole of it together, it is not entitled to that position which a plain, open and cordial answer may always claim in a court of justice. Looking at it in the most favorable light, it presents a suspicious case; one not easy to be

[Diehl et al. v. Page et al.]

reconciled with a fair and bona fide transaction.   Without going into a minute dissection of it, which would be tedious and is unnecessary, I shall proceed to the facts of the case, as they are exhibited by the evidence.

It appears that Guier and Diehl, in the year 1818, recovered a judgment in the city of Philadelphia against John Page.   This was revived by scire facias in 1824, and an execution issued against his goods and chattels and lands, which was returned by the sheriff "*nulla bona*."   In the spring of 1825, Page came into possession of the property in question, by the judgment of law.   Before this, Booth and Page were acquainted.   Booth was a tenant of Joshua Longstreth in Philadelphia, and he is stated by him in his evidence to have been poor; insomuch that he left the house he occupied without the knowledge of his landlord, and without paying the rent.   Page called on Longstreth as the friend of Booth, and begged him not to be hard with him, representing him as *very poor*, and *without the means of supporting his family.*   Longstreth sued Booth, and in 1823 obtained a judgment for thirty-five dollars, and Page became his bail.   In 1824 he took the benefit of the insolvent laws.   By the schedule of his property and debts, as filed, it appears that his debts amounted in the whole to seventy-four dollars, and that the whole number of his creditors was three, of whom Longstreth was one; and also that he had neither real or personal property. Longstreth further testifies, that he saw Page frequently for several years afterwards, and that he always represented Booth as poor and unable to pay.   These facts are undisputed.   Part of them are proved by record evidence.   And yet this is the man to whom Page, in June, 1825, only a year after he took the benefit of the insolvent laws, and while he was representing him so poor as to be unable to support his family, conveyed this valuable property, worth at least two thousand dollars.   The very statement is sufficient to excite surprize and suspicion.   But the subsequent part of the transaction is still more surprizing.   Page conveyed the property for the sum of two thousand dollars, on the fourth of June, 1825, and took Booth's own bond for the

purchase money, payable the same day, with interest. Such is the statement of the answer, and Page cannot dispute his own admissions. There was no money paid, no mortgage given, no judgment bond, no security of any kind taken. And even the bond which is alleged to have been taken by Page, and which must have been in his possession, is not produced or made evidence before the court. The transaction carries on the face of it strong marks of fraud, and needs explanation; and the more so, as Page himself does not appear to have been a man of visible property; for it was in 1824 that the sheriff of the county of Philadelphia returned the execution against him *nulla bona.*

How is it attempted to be explained? Page, without answering a word as to the poverty of Booth, says, he was a comb-maker in the city, " of a respectable character and of reputable standing; but the business of comb-making not agreeing with his health, and being desirous of changing his business for one of a more active nature, and knowing of this property that the defendant had recovered in New-Jersey, he proposed to purchase the same, and after going to the premises and viewing the same, he agreed to give this defendant four thousand dollars for the same, which was supposed could be easily made by a person going thereon and felling timber and wood;" that he had full confidence in the integrity of Booth, and believed he would be enabled to pay him by instalments, *or otherwise.* That Booth was not a common day laborer; that he believes the sole reason why Booth has not paid the consideration money is, that he has been prevented from going on the premises and realizing the profits to be derived therefrom by the sale of timber and wood and otherwise; and that if Booth is now in the reduced circumstances in which the complainants represent him to be, it may be attributed to their proceedings.

Such is the account of Page himself; and in my opinion it is entirely unsatisfactory. It is difficult to believe that Page could have been so silly and ignorant of business, as to convey this property to a man not worth a cent, an artisan entirely unacquainted with the management of a farm, and rely on being

[Diehl et al. v. Page et al.]

paid by the produce of timber and wood to be cut off the property. He does not show that there was a surplus of timber that might have been appropriated to the payment of the purchase money, without injury to the farm; or that, taking the whole of it together, there was enough for that purpose. It rather serves to show, that Booth was merely the agent and servant of his friend, Page; and that he lent himself to a fraudulent transaction for the purpose of serving him.

This is confirmed by the testimony of Peter Wright, who says that Page, in conversation with him soon after he got possession of the property, observed that he thought it was best for him to sell it as quick as he could, or as soon as he could after he got possession of it, for fear his creditors would come on him and take it from him, or words to that effect. This explains the matter more satisfactorily than the answer, and furnishes a key to the whole mystery. He also told Thomas Wright, that if he, Page, did not sell the property, other people would sell it from him.

In addition to this, it appears that after the alleged sale to Booth, Page exercised acts of ownership over it, offered to sell it, and in all respects treated it as his own. According to the testimony of Thomas Wright, the tenant, Page called on him in the forepart of the year 1825, to let him know he had recovered a moiety of the property on which he, Wright, then lived. The other half belonged to Jemima and Rebecca Bullock. In October, 1825, Jemima Bullock and Wright called on Page, in Philadelphia, respecting the rent of the farm. The object of calling was to fix the rent, and there was then an agreement made between them, that is to say, Jemima Bullock, Page and Wright, for the rent; and it was fixed at four hundred and fifty dollars per annum, and was to continue till the expiration of the lease. At this interview, which was four months after the alleged sale, not a word was said about the sale. The tenant expected to pay half the rent to Page, as a matter of course, and the other half to the Bullocks. But again, at this meeting Page insisted on Jemima Bullock's purchasing his half of the farm.

He asked five thousand dollars for it, and urged her to take it. Why this, if the property was already sold and in the hands of a bona fide purchaser. This, it will be observed, was before the service of the attachment, and while the property was in the hands of Booth, who, according to the answer of Page, expected shortly to remove upon it, and make the price of it by cutting the wood and timber from it. If Booth had been an honest purchaser, and the actual owner, would Page have undertaken thus to deal with the property of another man? Surely he could claim no such right under his warranty, however general; and the power of attorney does not appear to have been thought of till long afterwards.

It is not till after the service of the attachment that any thing is heard about the sale of the property. Then, when the tenant told him that the farm and all the moneys due him were attached, and not before, he told the tenant he had sold the farm. He told the tenant to come to him with the rent, and he would take him to Booth, the person who had bought the farm. The tenant asked where Booth lived, but Page did not tell him. In the spring Page and Booth came for the purpose of collecting the rent; but Page was the principal and acting man in the business, and appeared to have more interest in it than Booth.

I think the evidence shows clearly, that there was a perfect understanding between Page and Booth, and that the one was in fact but the representative of the other; that the whole formula of sale was a mere cover, and designed to protect the property.

Page, it is true, affirms that he at no time exercised any acts of ownership over the property after the sale; nor, as the real owner of the said premises, did he make any contract or offer of sale of the same, by mortgage or otherwise, for himself or in his own name. But this is contradicted, as has been seen, by the testimony of Thomas Wright. And if any thing more is necessary to overcome this part of the answer, it is furnished by the evidence of John Tufts; who says that about three years ago, John Page offered to sell the property to him, and made him sub-

sequent offers of the same character within two years.  He told⁫ him that the suit of Guier and Diehl would be settled, and he would make him a good title to the property.  Mr. Tufts states in addition, that the day before the examination, in talking upon the subject with Page, he, Page, told him he made him those offers under a power of attorney from Booth.  But Tufts states explicitly, that he never heard until that time of a power of attorney.  There is something remarkable in this circumstance. Tufts swears that all these conversations were within three years; that is, not longer back than July, 1831.  John Page is seen pressing the witness to purchase the property, offering to make a good title for it, and representing it, by necessary implication at least, as his own.  Now he insists that he acted in that matter under a power of attorney from Booth, and that by virtue of that authority he made the offer.  Yet when we come to look at the evidence, it is seen, that as early as June, 1829, (two years before,) Booth had made a conveyance of all his interest to Atkinson and Clark, and an exemplification of the deed is actually produced by the complainants; and there is reason to believe that Page knew this, for he told Wright, the tenant, that Booth had sold the property to Clark and Atkinson.

So far as Page and Booth are concerned, it is unnecessary to spend further time in investigating the testimony.  It is a clear case of fraud, badly concerted and clumsily executed, and against the consequences of which it is the duty of the court to protect those having lawful rights.  As to the other defendants, Clark and Atkinson, their situation is no better.  If not actual parties to the fraud, they hold under a fraudulent title.  They are not bona fide purchasers for a valuable consideration, and without notice.  They have not pretended to set up any such defence.  Nor could they have done it with truth; for when they purchased the property it was in possession of Page, and not of Booth; and possession is notice sufficient to put the party on inquiry.  The answer of these defendants is very like that of Page, and obnoxious to the same remarks.  It shows that no money passed at the time of the purchase; and sets up that they agreed to give

four thousand seven hundred and fifty dollars, and to secure it they gave a mortgage for the whole. They undertake to assign a reason for the purchase, and it is as follows:—" These defendants further answering, say, that the rents due by the tenant, and the issues and profits of the said premises, lying dead and unproductive, and the said Isaac H. Booth not being able to go upon the premises by reason of the proceedings of the said Thomas Diehl and his confederates, the said Booth sold and conveyed the said premises to these defendants; and by reason of such their proceedings at law and equity, the rents, issues and profits of the said premises are unproductive and withheld, and which tends to the manifest wrong, injury and detriment of these defendants."

This appears to me a singular reason for the purchase, but not more so than all the proceedings in this extraordinary case. These defendants had parted with all their interest to Robert Leeds, long before this answer put in, and yet no mention is made of it. They answer as though they still claimed the property, and the rents and profits of it.

Leeds has been examined as a witness. He agreed to purchase of Champion Clark and Keziah Clark, who owned the whole of the moiety, for two thousand seven hundred dollars, and was besides to settle with an old gentleman in Philadelphia, who would, as Mr. Clark said, be very easy to be treated with. This old gentleman turned out to be John Page. Page said the bond and mortgage were transferred; and said, " Clark, you know when the mortgage was given, and for what sum." The principal and interest amounted to about six thousand dollars. This must have been the bond and mortgage given by Clark and Atkinson to Booth, and which had come into Page's hands; showing still that Booth was merely the agent of Page. Page said, he had received bonds and mortgages on the property, and had a power of attorney from another person, and that under that power he had control of the property. Of this there can be no doubt. And I think it plain from the whole case, that he has the control

of it still.   Not a dollar has ever been paid by any one of the purchasers, nor was it intended that any should be paid.

It is not a pleasant duty to set aside conveyances on the ground of fraud ; but when justice requires it, it should be done without hesitation.   In the case before me, I cannot doubt ; and I shall therefore order the conveyances from Page to Booth, and from Booth to Clark and Atkinson, to be set aside and annulled, as fraudulent and without consideration, and therefore void as against these complainants.

        Decree accordingly.